**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Dec 20 2012, 9:25 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LINDA L. HARRIS**
Kentland, Indiana

ATTORNEYS FOR APPELLEE:

**ROBERT J. HENKE**
Indiana Department of Child Services
Indianapolis, IN

**LINDA KAMPE HOUTZ**
Indiana Department of Child Services
Fowler, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN RE THE TERMINATION OF THE PARENT CHILD RELATIONSHIP OF J.M., M.M., A.M. AND S.M.: | ) ) ) ) | |
| R.M. & H.M., | ) ) | |
| Appellant-Respondent, | ) ) | |
| vs. | ) ) | No.  04A03-1204-JT-184 |
| THE INDIANA DEPARTMENT OF CHILD SERVICES, | ) ) ) | |
| Appellee-Petitioner. | ) ) | |

APPEAL FROM THE BENTON CIRCUIT COURT
The Honorable Rex W. Kepner, Judge
Cause No. 04C01-1110-JT-102 thru 109

**December 20, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**PYLE, Judge**

H.M. ("Father") and R.M. ("Mother") (collectively, "Parents") appeal the involuntary termination of the parent-child relationship with their children, J.M., M.M., A.M., and S.M. (collectively "the children").

We affirm.

## ISSUE

Whether there was clear and convincing evidence to support the termination of Parents' parent-child relationship with J.M., M.M., A.M., and S.M.

## FACTS

Parents were married in 2005 after having raised their biological children from previous relationships. They became licensed foster parents in 2006. In 2007, Parents became foster parents to L.M. and Je.M., who are not part of this appeal, and subsequently adopted both boys. During 2007 and 2008, Parents became foster parents to J.M., born in 2004, M.M., born in 2006, A.M., born in 2007, and S.M., born in 2008, and subsequently adopted all four children.

L.M. and Je.M. were removed from Parents' care in December 2009 because of Parents' inappropriate use of discipline. Specifically, there was a report that Mother burned L.M.'s hand on the stove. Both boys were adjudicated to be children in need of services ("CHINS"), and the Benton County Department of Child Services ("DCS") offered services to Parents, including family preservation and visitation.

2

In July 2010, during the course of the CHINS proceedings for L.M. and Je.M., a case manager went to Parents' home and discovered an unhealthy living environment for the remaining four children. Specifically, the case manager found dried feces on the wall in J.M. and A.M.'s bedroom. The case manager further found broken toys in the toy room with sharp edges exposed; clutter stacked throughout the house; paint cans, bleach, knives, and electrical cords within the children's reach; dried blood on pillows in one of the children's bedrooms; and no sheets on any of the beds. Parents had eleven dogs, and there were feces in the toy room around the toys. Mother admitted that she locked the children in their bedrooms at night without access to a bathroom.

The children were adjudicated CHINS in November 2010, based on Parents' admissions. Following a dispositional hearing, Parents were ordered to attend supervised visitation with children, help visitation facilitators develop a behavior modification plan for the children, and use the plan during visitation. In addition, Parents were ordered to refrain from using physical force or restraint against the children unless there was a life or health endangering situation. During the pendency of the proceedings, DCS filed a Termination Petition in the case of L.M. and Je.M. Parents admitted the allegations in the petition and the trial court issued an order terminating their parental rights to L.M. and Je.M.

In October 2011, DCS filed a petition to terminate Parent's parental relationship with J.M., A.M., M.M., and S.M. The evidence at the termination hearing revealed that Mother suffers from a major depressive disorder as well as an adjustment disorder. She

is physically disabled by degenerative disc disease and also suffers from fibromyalgia. A parenting assessment revealed that Mother is at a high risk for child neglect. Father tends to distance himself from a relationship with the children. Six-year-old J.M. suffers from attention deficit and hyper-activity disorder as well as bipolar disorder. He picks his skin until it bleeds and bangs his head on the floor. His anger issues are exacerbated by environmental situations. Four-year-old A.M. suffers from adjustment disorder, reactive attachment disorder, and autism spectrum disorder. He bites and hits others, urinates throughout the house, and exhibits eroticized inappropriate touching of himself and others. One-year-old S.M. has speech and motor delays.

After Parents cleaned up their house, supervised visitation with the four children took place there. During the course of two years, seven visitation facilitators supervised Parents' visits with the four children. All seven facilitators had concerns about the safety of the children and Parents' ability to properly discipline them. For example, the children were physically violent with one another without parental intervention. A.M. twice attempted to choke two of his siblings. He also threw objects at Mother and injured her severely enough on one occasion that she needed to seek medical attention. The children's behavior also caused Mother to suffer a panic attack that resulted in her going to the hospital. During one visit, Mother sat on the floor and cried. She asked A.M. why he was so mean to her. The children played on or around the stove top and stood on barstools without parental intervention.

4

Inappropriate objects such as tools and a power drill were repeatedly left where the children could and did access them. The children grabbed and ingested items off the counter, including coffee cream and hot sauce that led to vomiting. Mother had to be prompted by a facilitator to give A.M. a breathing treatment while he was having an asthma attack. Mother also had to be prompted to change the younger children's soiled diapers and engage them in the process of toilet training and to praise or compliment the children on their good behavior. Both parents used inappropriate physical force to discipline the children and yelled and cursed at them. Father was physically aggressive with them.

At the termination hearing, testimony from all service providers revealed that the parents have exhausted all available assistance and would not benefit from further services. Danielle Menefee, the DCS family case manager, testified that she believes the children's safety is in jeopardy because of Parents' continued lack of supervision and discipline. She further explained that Parents' inability to implement consistent parenting skills posed a danger to the children and their behavior would only get worse. The Guardian Ad Litem ("GAL") testified that termination is in the children's best interests because Parents have not made the necessary improvements in their supervision, discipline, and parenting skills to meet their children's basic needs. According to the GAL, Parents were too quick to anger and too slow to respond to safety concerns, and it concerned him to think what could happen to the children if the visitation facilitators were not present.

5

The children have been in foster care since they were removed from Parents, and their behavior with the foster parents has improved over the two years. A.M. is no longer urinating in inappropriate places, smearing feces on the walls, or hiding food. S.M.'s motor skills have improved, and J.M. has fewer discipline problems at school. The foster parents are interested in adopting all four children.

Following the four-day hearing, the trial court issued an order terminating Parents' parental rights. Specifically, the trial court concluded that the continuation of the parent-child relationship posed a threat to the children's well-being because Parents were not able to provide the structure and supervision the children need to remain safe. Parents were also not able to provide the routine and consistency necessary to address the children's behavioral issues, and they failed to notice and remedy safety hazards to the children. Parents appeal the termination.

DECISION

The purpose of terminating parental rights is not to punish parents but to protect their children. *In re D.D.*, 804 N.E.2d 258, 264 (Ind. Ct. App. 2004), *trans. denied*. Although parental rights are of a constitutional dimension, the law allows for the termination of those rights when parties are unable or unwilling to meet their responsibility as parents. *Id.*

The juvenile court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re R.S.*, 774

N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *Id.* The juvenile court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.*

Parents argue that there is insufficient evidence to support the termination of their parental rights. This court will not set aside the trial court's judgment terminating a parent-child relationship unless the judgment is clearly erroneous. *Id.* at 929-30. When reviewing the sufficiency of the evidence to support an involuntary termination of a parent-child relationship, we neither reweigh the evidence nor judge the credibility of the witnesses. *Id.* at 930. We consider only the evidence that supports the judgment and the reasonable inferences to be drawn therefrom. *Id.*

Indiana Code § 31-35-2-4(b)(2) sets out the following relevant elements that DCS must allege and prove by clear and convincing evidence in order to terminate a parent-child relationship:

When DCS seeks to terminate parental rights, it must plead and prove, in relevant part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

7

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services . . . .

Ind. Code § 31–35–2–4(b)(2).[1] These allegations must be established by clear and convincing evidence. *In re I.A.*, 934 N.E.2d 1127, 1133 (Ind. 2010). If the trial court finds the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. I.C. § 31–35–2–8(a).

Parents' sole argument is that that the DCS failed to prove that there was a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the children. The trial court should judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.*. However, a parent's habitual patterns of conduct must also be considered to determine whether there is a substantial probability of future neglect or deprivation. *Id.* A trial court does not need to wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Castro v. Ind. Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied.* When the evidence shows that the emotional and physical development of a child is threatened, termination of parental rights is appropriate. *Id.*

---

[1] Indiana Code § 31–35–2–4 was amended by Public Law No. 48–2012 (effective July 1, 2012). The changes to the statute became effective after the filing of the termination petition involved herein and are not applicable to this case.

Here, our review of the evidence reveals the children suffer from delays and disorders that require parental supervision and discipline. Mother is physically disabled and suffers from a major depressive disorder. Father is physically aggressive with the children and tends to distance himself from a relationship with them. After two years of supervised visitation and the provision of services, the service providers all agree that both parents have exhausted all available assistance and would not benefit from additional services. The service providers also agree that the children's safety is in jeopardy when the children are with Parents and that a continuation of the parent-child relationship poses a threat to the well-being of the children. This evidence supports the termination of Parents' parent-child relationship with J.M., M.M., A.M., and S.M.

We reverse a termination of parental rights "only upon a showing of 'clear error' — that which leaves us with a definite and firm conviction that a mistake has been made." *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1235 (Ind. 1992). We find no such error here and, therefore, affirm the trial court.

Affirmed.

ROBB, C.J., and MAY, J., concur.

9